Number 222660, Vista Food Exchange v. Comercial De Alimentos Sanchez. Thank you. May I proceed, Your Honor? Mr. Scott, whenever you're ready. Yes, Your Honor. Good morning. May it please the Court? Jonathan Scott, I'm grateful to be before the Court on behalf of my long-term client, Vista Food Exchange. We're here appealing a summary judgment order, which is a final order, granted by Judge Abrams. And I want to preface it by saying that everything that we're presenting today, we have the utmost respect for Judge Abrams. Respectfully, we think that the district court committed reversible error. The order itself, first of all, was based upon a theory of intervening superseding cause under New York law. And in the first instance, the New York jurisprudence, including that of the New York Court of Appeals, indicates that it is a rare case in which intervening superseding cause is a suitable defense for summary judgment. But going a step further, in this instance, this is not a remote or unforeseen claim of damages by Vista. Our claim is very simple and straightforward. This is a sale of goods between sophisticated companies that are merchants. It is governed by Article II of the Uniform Commercial Code. So that is the framework we would respectfully suggest to the Court for the analysis of the summary judgment motions. But yet, the Court will note that while Judge Abrams' decision is 23 or 25 pages long, there is absolutely no discussion in the district court's opinion about the Uniform Commercial Code. Our motion for summary judgment was based upon a very simple presentation. We opened a credit account as a seller of wholesale meat products, New York transaction. These products were not sold in Mexico. They were all sold FOB in the United States to Sanchez. Those terms of sale we operated with confirmatory writings as Vista was required to because every one of the transactions involved in this lawsuit for which we were not paid is more than $500.  And I hear you in the law, and you've done a nice job of briefing it. Some of this case is about the law. Some of it is about the facts. Of course, Your Honor. And one of the things that I'm just, I'm trying to make sense of the competing narratives that we have. And one of the things that I find puzzling is there's this $750,000, which I gather is for matches with invoices from 2014 forward. We have Sanchez saying that through 2013 there was $364,000 of invoices that we paid in cash and that were credited. And I'm trying to figure out one possibility. They're just lying. One possibility is that I'm playing with is if they're paying on an invoice base, but you're crediting it on an open account basis, is it possible that they paid, they were getting credited for the things they wired rather than for the actual cash. So the question behind all of this is if you add up all of the invoices over the years that this relationship was in existence and you add up all of the money that you claim you got, is the $750,000, is it $750,000 plus $364,000? How do we get to that? So, Your Honor, I'm happy to address that. I'm happy the court raised that issue. So that is an issue that was litigated or raised in the district court prior to summary judgment. And so in that regard, what happened was in the pretrial discovery, they secured an order from the magistrate judge requiring VISTA to search its records and then search its records again to see if there was a single solitary proof that matched up with any of these 2013 payments that they claimed to have made in cash. And there is no evidence, Judge, that we ever credited any payments. That's just speculation on their part. And we didn't get into it in the record because that was the issue that was framed. They claimed that we accepted cash. We have affidavits from both our president, Mr. Pacifico, who is here in court as well today, and from the chief financial officer that unequivocally confirms and reconfirms that we never accepted any cash payments. Now, the reason, which is not in the record, is that the money that they claim to have paid, what they don't tell the court is that in 2013 there were six or seven credit memos that were issued by VISTA because they claimed that they didn't accept the orders and that those orders didn't go through. And that amounted to approximately $300,000. And so it's not that we received those payments. So there may be a $40,000 or $50,000 delta with regard to 2013 because of those credits that were applied, the differential between the two. But when we brought the suit, we thought it was simpler to focus on what they've acknowledged were the transactions that they went forward with in 2014 and that they didn't pay. When your client gets the payments in- Yes, Your Honor. I'm just suddenly coming through wire. Do they get credited to the oldest outstanding invoice or do they get credited to the invoice that's designated with the payment if an invoice is designated with the payment? It generally was applied on account. Sometimes if the customer requested, if they sent in, for example, a $75,000 payment and said, please apply it to payment 100 and 102, then the corporate office would attempt to do that. But at the end of the day, this was an open credit account and their claims that we accepted cash payments, we dispute that. That's controverted unequivocally. But I would say as well, Your Honor, that that really, I mean, that's a part of this record, but that's prior dealings. And so we're here on the contracts that were issued starting in January. So now you're making an alternative factual argument. Am I following you correctly? No, Judge Parker. All I'm saying is that with regard to the Uniform Commercial Code 2-202, course of performance evidence, if it contradicts the express terms of the written contract, is not admissible or it doesn't take priority. That's 2-202. And so what we're saying is this may be an interesting point of discussion, but it is not material and the materiality should start, respectfully, from the first order that was placed in 2014. That's an interesting argument. I mean, if we're saying that you can't look at course of dealing, when the written instrument calls for payment at their place of business, I don't think there's any evidence that any payments were delivered by check to their place of business. They were wired to their bank down the street. So isn't this entire course of payment shaped by a course of dealing rather than by express terms of any writing? I would say that course of dealing from the point forward after the first order was placed becomes pertinent if they're trying to vary the course of dealing. But our point is that Vista never agreed, with regard to these invoices, to change the place of performance from New York to Mexico. Okay, but the invoices don't say place of performance is New York. They say place of performance is our business address in New York, right? So it seems to me you're either sticking by the writing or you're allowing for course of dealing to vary from the writing. I don't see how you can have both. Yes, Judge Robinson, but I think the distinction here is what I'm saying is when the course of dealing is inconsistent with the writing, that's where the writing takes priority. So the fact that they sent wires going back to 2011, 50, 75, 100 times, including after they claimed that the banking system in Mexico was broken and that they could no longer send wires, that is course of dealing evidence, a lot of course of dealing evidence in the record, that is consistent with the terms that required them to remit payment to New York. And once that request, once that was made, that confirmatory writing, the Uniform Commercial Code puts the obligation on the buyer to make a written objection. There was not a single solitary written objection. So our invoices starting in 2014, sent to Sanchez, specify, as your Honor just said, a payment to our office in New York. If hypothetically you had accepted cash payments delivered through your agent, and had credited them to the account throughout 2013 to the tune of $364,000, Is it your position, I think as I understand it, it would still be a breach of contract and you would still be entitled to damages. You wouldn't be a stopped from raising some sort of objection to payment in cash, if in fact you had been accepting it this whole time? I'm sorry, Your Honor, can you rephrase that? If you had been accepting cash for a year, would you be a stopped from then saying a year into that relationship? Retrospectively, you breached your contract by paying us in cash, having accepted it for that time. In other words, would that shift the onus to you to say, okay, we're going to stop accepting it in cash? Or is it your position that each time that happened, it was a breach of contract that, I guess, in that hypothetical, you forgave? Your Honor, we're not alleging in this case that they breached the contract by paying these invoices in cash. What we're saying is they breached the contract by not paying the party that they bought the meat from in 2014, and that we were not paid. With regard to their claim that they paid someone else in cash, our position is that there really is no competent evidence. It's conclusory. So, yes, they've given an affidavit that they withheld for three years from a dead salesman, but that no one, there is no other evidence in this record, and we challenge the admissibility of that evidence, and we think it's a fabrication or it's false. So your factual argument is we don't believe you that you paid him. Are you also making a legal argument that even if you did pay him, that's not what the contract required and were entitled to, or that's not what the UCC would have required given that the invoice specified the place? Are you making alternative arguments, or is it entirely we don't believe you paid him cash? No, we are arguing, our primary argument here is a legal argument, and the legal argument is that this is textual. This is based upon what the document says and the fact that they made no objection at any point in time. And furthermore, that their claims that they obtained authorization to modify the place of their performance is not valid under New York law. Because as we've pointed out, the New York law is very clear. They have statements that they attribute to the dead salesman as the agent, and the statements of an agent cannot create authority. And so what we have is you have a summary judgment record in which they make very speculative allegations that are of no evidentiary value. So you have Fernando Sanchez, for example, saying that he contacted Vista and asked them what forms of payment were acceptable. Nobody's identified. That can't possibly be establishment of authority. Then they say they spoke to the salesman and they asked him what forms of payment were acceptable. Again, the other thing that we think is key to the conclusion that is a matter of law, they haven't proven that what they did, this was unauthorized with regard to these transactions we're suing on. They didn't talk to anyone. I think we have your argument, Mr. Scott. You're reserved a few minutes for rebuttal. Thank you. Mr. Cohn. Good morning, and may it please the court, Jacob Cohn for the appellee, Sanchez. This comes down to really two things. Was Rascon paid the money? I don't hear a serious argument that the factual record is not undisputed, that my client paid the monies to Rascon. And unless you have questions about it, I'll proceed. I guess I do. I understood that to be very much in dispute. So I understood the argument to be, A, part of their story about having paid Rascon is that they had $364,000 worth of credited cash payments to Rascon, and they're denying that they ever received accredited cash payments. So part of the building blocks of that story is gone. I think they're pointing to the timing by which the disclosure of the Rascon payments was made as suspicious and calling into question whether they're made. Why isn't that enough to get them to a jury? Well, because . . . sorry, are you familiar? No, that's fine. Judge Robinson, the issue is not their internal bookkeeping. The issue is whether or not Rascon was an agent and received the money. Okay? He received the money. There's undisputed record of the monies being paid to Rascon. Now, whether or not it adds up to the numbers in their internal accounting is kind of an interesting thing when you go back and forth on accounts stated in their UCC arguments, which I'll get to in a moment. But there is no material issue of fact in dispute that there is anything . . . But that's because you have a theory of fact that they can't really . . . they're not in a position to prove or disprove. And I guess that's why my concern has to do with the distorts finding an approximate cause. Isn't it foreseeable that if you give a salesman $750,000 in cash in Tijuana that it could go missing? Is that something that . . . Is that something a jury should decide? I would defend Judge Abrams' thought . . . You're asking us to take it as fact now because your friend couldn't disprove it. But it seems like inherently something that cannot be proven or disproven by somebody who's a third party. Well, the payment of cash to the agent is, I believe, indisputable on the factual record that is before the court. Whether or not . . . If there were a contractual breach by paying the agent, it is an issue of approximate cause that it was a bad idea to pay the agent cash. I will be candid. That's why the bulk of our argument is there was no contractual breach. Judge Abrams said, let's assume arguendo. There's a contractual breach here by paying the later turns out to be unfaithful agent. And our point is there's no contractual breach. There's no contractual breach because all of these sale orders to begin with don't require performance of payment. I'm trying to make sure I understand what you're saying. Are you saying right now it doesn't matter whether it was foreseeable? Well, my point is to get to that issue, you have to say there was a breach of the payment term, which I'm telling you is not a term. It doesn't matter if it was foreseeable that the money . . . Number one, you don't have a payment obligation to make payment. It says, please remit to. That's precatory. Okay, that is optional. That is from them. That is not something that they can enforce, number one. Number two, they have a guy, Raspall, who is their representative in Mexico, who has significant latitude to deal with clients and customers. I brought one piece of paper here because as I was preparing for this, it was not trial counsel. I'm looking at a dead paper record like you are. And I'm looking at where is something in the record. If I'm your law clerk, what am I going through? This is joint appendix 56 and 57. And this is the employment contract between the appellant and their agent. And it perfectly, perfectly anticipates that he may receive monies from customers. That agreement says that VISTA gave Rascal the authority to accept cash payments. I'm saying that it is implicit here because it requires you must inform VISTA in writing within five days from your receipt of any payment that you receive from the above activities. Okay, and what are the above activities? During your employment, you must devote your full business efforts and time to pursue business activities related to the food industry only for VISTA's benefit. Okay, and I very much looked at the proximate cause argument and the argument you shouldn't be giving people money like this. And you look at some of the cases that are cited, and there are cases where people give somebody a bunch of money and it turns out they're not the agent. And this is not one of those cases. This is a case where you have the agent, you have the agency, you have the payment, you don't have a contractual breach for several reasons. You don't have a contractual breach because the contract doesn't require the remittance of payment to their office in the Bronx. It says, please, there is not a breach of contract because they never received payment in their office in the Bronx. There were payments that were made by wire. There were payments that were made in cash. And that is not a breach. And they have an unfaithful servant, and the unfaithful servant absconded, and that was their risk. And I think that is the correct basis to affirm the summary judgment grant as a matter of law. Thank you. If you have no further questions, I'll sit down. Thank you, Counsel. We'll hear about it. Thank you. I'd like to address first the misreading, respectfully, of the employment agreement with regard to any payments that are received by the outside of activities for VISTA. I know that document inside and out because I drafted it for the company. That is a provision that has to do with competing with the company while employed there. And if they make money unrelated to their business with VISTA, then there's an obligation to account. There is absolutely nothing in the record that authorized a salesperson to accept cash payments. In fact, to the contrary, there are multiple affidavits from the chief financial officer, Alan Butterfass, and from Mr. Pacifico, the president of the company, that not only explain that there never was such an authorization, but that furthermore this narrative that's being presented in the lower court and renewed here again by Sanchez is something that is news to us. So the company knows nothing about this story until they first start talking about a claim that they had paid any money to Eduardo, to the former salesman. They first said that. The first communication is in March of 2015. That's in the record. It's an email. Prior to that, complete radio silence. Not one writing. And even looking at their evidence. They don't allege that they had any communications with VISTA from January 2014 forward. So they never contacted us. Although I suppose they say, well, of course we had contact with VISTA. We were dealing with Mr. Raskin the whole time, and he is VISTA, right? Isn't that their argument? I know they've claimed that, Your Honor, but with regard to something that would bind us to the risk of loss, we would respectfully submit that if there's going to be a risk of loss, the risk of loss has to be something that was agreed to and undertaken by an authorized person, management of the company. And I would also, very important, Judge Park, you made the observation that VISTA is in fact challenging whether or not the invoices were paid in full. And counsel says, no, that's not in dispute. I would point the court, and there's many other things in the record. Paragraph 79 at page 427 of the joint appendix is our response to Sanchez makes this allegation. Sanchez has paid in full all 39 invoices at issue in this lawsuit, based solely on the Fernando Declaration, which, as I've said before, is entirely conclusory. They talk about we continue the same cash payment method as before. That's not evidence. What we said in response is, goes from page 57- We need a little bit of time to wrap up. And all the way to the bottom of 57. We are disputing that, and we cited the countervailing evidence that does that. Last point, if I might. An agent is not an agent under New York law for all purposes. Saying that someone was the salesman and he had the authority to sell us meat and this is who we dealt with does not establish that he has the authority to negotiate contracts on behalf of the company. And, in fact, the record is undisputed that he never had any such authority, and it was outside the purview of his job. In fact, he never even worked in the finance office. And both Mr. Pacifico and Mr. Boniface have unequivocally said that if this narrative or this story about paying Vista's invoices that they intended to or proposed to pay in cash to the salesman in Tijuana, we would have closed the account. So we're here because they made unilateral decisions without authorization, without complying with the Uniform Commercial Code. Thank you. Thank you, counsel. Thank you both. We'll take the case under advisement.